United States Courts
Southern District of Texas
FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

MAY 2 3 2024

Nathan Ochsner, Clerk of Court

| | | |
|---|---|---|
| Thomas Edwin Olson, **Plaintiff** | § § § | |
| vs. | § | Case No. 4:24-CV-01553 |
| United States Veterans Initiative, *et al.,* **Defendants** | § § | |

## PLAINTIFF'S FIRST AMENDED PETITION

### TO THE HONORABLE JUDGE OF SAID COURT:

**COMES NOW Plaintiff,** Thomas Edwin Olson ("Olson" or "Plaintiff"), by and through his own hands as *counsel pro se,* files Plaintiff's First Amended Petition against United States Veterans Initiative, *et al.* ("Defendant" or "Defendants", or "USVI") where the Plaintiff alleges as follows:

### BACKGROUND

After filing Plaintiff's Original Petition, the Defendants retaliated, evicting him by calling it a "discharge" from the "Veterans Village", a homeless shelter operated under the guise of a clinical treatment facility, funded by grants and contracts from the Department of Veterans Affairs ("VA"), and donations from individuals and corporate entities.

Upon his eviction, Plaintiff could not seek emergency relief from this venue. Having filed a Motion for Leave and a Motion to Proceed in *Forma Pauperis,* he was unable to appear herein to ask for such relief. He immediately turned to the Harris County District Court seeking an order for relief to prevent his eviction pending a hearing in this venue.

Therein, Plaintiff's motion was denied, based on Defendant's counsel's representations that Plaintiff was Defendant's patient, discharged from Defendant's clinical setting. The Defendants do not have a license to operate a facility for mental healthcare by the State of Texas.

In the Plaintiff's Original Petition and in this amended petition, Plaintiff is asking for this court to address this genuine and very ripe controversy:

> "*Can the operational policies and procedures of a nonprofit organization, funded by grants and agreements for services by the United States Department of Veterans Affairs, usurp the human rights and civil rights protected by federal law of the people (military veterans and their families) it serves under the guise of 'safety' or 'no weapons' policy?*".

Plaintiff was injured on October 3, 2023, during surgery at the Houston VA. Due to the negligence committed in the process, portions of plaintiff's left leg became paralyzed, leaving him unable to walk or work, resulting in his inability to work and eventual homelessness. In January 2024, Plaintiff contacted a Homeless Veteran Care Coordinator, who is a licensed social worker, at the Houston VA for assistance. He was placed in a homeless shelter, known as "Veterans Village", operated by Defendants. There, Defendants provide at least room and board for homeless veterans.

Plaintiff underwent abdominal surgery three months prior to the surgery that caused his paralysis. His diet required that he eat smaller pieces of food. He met most of his dietary needs on his own until the defendants confiscated a three-inch kitchen knife, the kind found in almost every household, under the guise of a "weapons" ban. When the knife was confiscated by Defendants, Plaintiff's diet transformed from a self-adjustment to a medical condition to an actual disability, forcing him to rely on Defendants to make reasonable accommodations.

Plaintiff repeatedly asked Defendants by email, orally, and on submitted forms to provide him with reasonable accommodations under federal law. In a meeting convened by Plaintiff's VA liaison, a VA employee, the liaison requested that reasonable accommodation always be made available to Plaintiff. After the plaintiff exhausted all extrajudicial remedies available to him, he repeatedly warned the defendants over a two-week period that he would seek judicial relief. Plaintiff eventually filed the Original Petition for Injunctive Relief and Declaratory Judgment, see

Dkt. 1-1, Apr. 15, 2024, filed at 9:58, as well as a Motion to Proceed in Forma Pauperis, in which Plaintiff sought injunctive relief to compel Defendants to comply with federal law.

After Plaintiff filed the petition, Defendants retaliated by expelling him from Veterans Village, labeling it a "discharge"," in violation of federal laws protecting disabled individuals and whistleblowers from retaliation.

## PARTIES

1.  Plaintiff, Thomas Edwin Olson, (Plaintiff or Olson) is again homeless, living in the Houston area, and using his brother's home address for this court. He can receive mail and correspondence or service from this court at 7342 Grandview Meadow Drive, Magnolia, Texas 77354. The Plaintiff also has Pacer/CM-ECF access with account number 6374371 and can receive filings there. The Plaintiff's email address is olson@webtoaster.com. The Plaintiff has filed a motion to use the CM/ECF system.

2.  Defendant(s), United States Veterans Initiative (USVI), also known as "U.S. Vets" or "U.S. Vets Inc." can receive service at:

    > **United States Veterans Initiative**
    > **c/o Stephen Peck, CEO**
    > **800 West 6th Street, Suite 1505**
    > **Los Angeles, California, 96017**

    USVI is registered as a non-profit organization under 26 U.S.C. § 501 (c)(3), with Tax Identification Number 95-4382752. Defendants conduct the day-to-day operations of the "Veterans Village", located at 18818 Tomball Parkway, Houston, Texas 77070. This location is situated in the Southern District of Texas.

    The Defendant's in-house legal counsel is Carla Ford. Ms. Ford is a former Assistant U.S. Attorney with the Department of Justice at the U.S. Attorney's Offices in Los Angeles, California, California State Bar No. 173380., Ms. Ford retained Mark D. Sonnier as local legal counsel on

April 16, 2024. *See Exh.* 41; however, as of May 21, 2024, Mr. Sonnier states in an email to the Plaintiff that he is not representing the Defendants in this matter. *See Exh.* 42.

3.   The Stephen Siller Tunnel to Towers Foundations, commonly known as "Tunnel to Towers", is also a not-for-profit corporation under the laws of the State of New York and is recognized by the Internal Revenue Service as a public charity under 26 U.S.C. § 509 (a)(1) and as a tax-exempt organization under 26 U.S.C. § 501 (c)(3).

## JURISDICTION AND VENUE

4.   This Court has jurisdiction over this action under 28 U.S.C. § 1331, as the claim arises under the Americans with Disabilities Act (ADA) of 1990, as amended, the Rehabilitation Act of 1973 (RA), as amended, and the C.F.R.

5.   This Court has jurisdiction over this action under 28 U.S.C. § 1331 because the Plaintiff is making an application for this court to refer this matter for further investigation by the United States Attorney General, Civil Rights Division.

6.   This Court has jurisdiction over this action under 28 U.S.C. § 1332 for the diversity of citizenship.

   a.   The Plaintiff, Thomas Edwin Olson, is a resident of Texas;

   b.   The Defendant, United States Veterans Initiative's address is in Los Angeles, California; and

   c.   Stephen Peck, United States Veterans Initiative's Chief Executive Officer's address is 800 West 6th Street, Suite 1505 Los Angeles, California, 96017.

7.   Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

8.   Venue is proper in this district under 28 U.S.C. § 1391(c) because the Plaintiff resides in the district where these events took place.

9.   Venue is proper in this federal district court because the Plaintiff will ask this district court to appoint counsel under Title III of the ADA, 28 C.F.R. §§ 36.502 and 36.504.

## DEMAND FOR JURY TRIAL

10. Pursuant to Rule 38 of Fed. R. C. P. Plaintiff demands a trial by jury and requests that the District Court conduct the trial.

## FACTS

**VA's Grant Per Diem Program**

11. The Department of Veterans Affairs ("VA") administers the regulations published in the Code of Federal Regulations that govern how the Grant Per Diem Program ("GPD Program") is to operate.

12. 38 C.F.R. § 61 et seq. is entitled "VA HOMELESS PROVIDERS GRANT AND PER DIEM PROGRAM" with the stated purpose: "This part implements the VA Homeless Providers Grant and Per Diem Program, which consists of the following components: capital grants, per diem grants, special needs capital grants, and technical assistance grants."

13. Under the GPD Program, Defendants are required to provide participants with at least room and board. Participants may also receive mental health and wellness services, financial counseling, and employment skills training. *Id.*

**Tunnel to Towers and U.S. Veterans Initiative Inc.**

14. Tunnel to Towers owns and maintains the former three-story Wyndham Hotel at 18818 Tomball Parkway, Houston, Texas 77070, where Defendants conduct operations under the VA's Grant Per Diem Program ("GPD Program") to assist homeless veterans within the meaning of 38 C.F.R. § 61 et seq.

15. By way of clarification, Tunnels to Towers is the New York-based charitable organization that owns and maintains "Veterans Village". Defendants (USVI) are responsible for the policies, staffing, and operations affecting its participation in the Veterans Administration's ("VA") Grant Per Diem program pursuant to 38 C.F.R. § 61 et seq.

16. Defendants operate commercially, collect rents and fees for housing at Veterans Village, and receive funding from the Department of Veterans Affairs ("VA") to provide services under

the GPD program. Payments are made from the VA to Defendants' headquarters in California and from the local Houston office to Defendants' headquarters in California.

17. Some Veterans Village residents pay rent to Defendants and are not participants in the GPD Program.

18. Defendants employ more than 500 employees[1] that serve able-bodied, disabled, and homeless veterans daily by providing housing, meals, mental health and wellness, workforce development, and individualized support services.

19. The Defendants also operate as an apartment in a landlord-tenant relationship where some residents pay rent on a monthly basis.

**Nutritional Requirements and Surgery**

20. On July 11, 2023, the Plaintiff underwent a "Route En Y Gastric Bypass" ("Gastric Bypass Surgery") at Baylor St. Lukes Medical Center. *See Exh.* 1.

21. The necessity of weight loss surgery was a prerequisite to the Plaintiff undergoing Total Hip Arthroplasty ("Hip Replacement") surgery, to reduce the risk of complications by reducing the Plaintiff's weight.

22. Baylor-St. Lukes and Dr. Julie-Ann Lloyd MD, the Plaintiff's surgeon, prescribed the Plaintiff's dietary requirements ("Diet").

23. Repeatedly, the Defendants were given Plaintiff's documentation supporting his Diet. The Diet requires him to eat four to five meals daily, consume smaller pieces of food, and chew it thoroughly. The content of the food must contain a minimum of at least 60 grams of protein daily, with multivitamins and calcium supplements in perpetuity. *See Exh.* 6 (Attachment to email in *Exh. 5*) *see also Exh.* 7.

---

[1] *See* US Vets LinkedIn profile, https://www.linkedin.com/company/usvets/about/ last visited May 18, 2024

24.    Before entering the Veterans Village, the Plaintiff was self-accommodating for the requirements of his Diet.

**Hip Replacement Surgery**

25.    The Plaintiff underwent Hip Replacement surgery on October 3, 2023, at the Houston VA Hospital with complications. Therein, the Plaintiff's femoral and adductor magnus nerves of his left leg were severed or damaged causing Femoral Nerve Palsy ("Leg Paralysis"). In this condition, the four quadriceps muscles of the Plaintiff's upper left leg are paralyzed along with some muscles in the lower leg. *See Exh. 2*

26.    The Plaintiff undergoes Physical Therapy ("PT") on a weekly to twice-weekly basis to protect and strengthen the remaining muscles in his leg. This PT will continue until the nerves heal or if the damage is permanent for up to three years. The Plaintiff also uses a combination of a hinged knee brace, a cane, and a wearable computer-controlled neuromuscular stimulator to ambulate on flat surfaces.

27.    The Plaintiff also undergoes Chiropractic treatments to correct his uneven gait (length of distance each foot moves per step), which affects his back muscles and spine.

28.    Both clinics are located within a 10-minute driving distance from the Veterans Village.

29.    The Plaintiff has a 75% chance of getting 75% of his muscle functionality back at 33 months post-operation[2].

**Claim for VA Disability Due to Surgical Injury**

30.    On November 1, 2023, the Plaintiff filed a disability claim under 38 U.S.C. § 1151 with the VA. *See Exh. 3.*

31.    This allows disability compensation for injuries suffered as a result of carelessness or negligence by the VA in place of litigation under the Federal Tort Claims Act.

---

[2] *See* Andrew N Fleischman, et al, "*Femoral Nerve Palsy Following Total Hip Arthroplasty: Incidence and Course of Recovery*", The Journal of Arthroplasty (2017)..

**Unemployability**

32. After the Hip Replacement, and due to the Leg Paralysis, the Plaintiff could not begin new employment or walk on uneven surfaces where his job would take him in and around Kerrville, Texas.

33. The Plaintiff's Leg Paralysis makes him unable to walk normally. While the Plaintiff has devices to support his limited mobility, he suffers from falls on a bi-weekly to monthly basis.

34. The Plaintiff cannot perform work for his own company[3], as a commercial unmanned aerial systems pilot[4] under federal regulations[5], because of the medication he takes to control the chronic pain in his leg. *See Exh.* 4 (bates stamped "VETERAN 00018")

**Homelessness**

35. The Plaintiff's physical disability ultimately caused his financial hardship causing the Plaintiff to become homeless[6] while awaiting a decision from the VA on the disability claim.

36. On January 17, 2024, with the assistance from a VA social worker who specializes in helping prevent homelessness in the veterans population, the Plaintiff was placed[7] into the Veterans Village facility owned by Tunnel to Towers, and operated by the Defendants, funded via the GPD Program[8], paid for with federal funds.

37. At the Veterans Village, the Plaintiff resided in a single occupancy room similar to those found in an extended stay hotel.

**VA Paid Defendants to Provide Shelter and Food**

---

[3] *See* Lone Star Intelligence, Surveillance and Reconnaissance, LLC; *see also* http://www.lonestarisr.com

[4] 14 CFR 107.1 *or see* FAR 107.1

[5] 14 CFR 91.17

[6] "Homeless" has the meaning given that term in section 103 of the McKinney-Vento Homeless Assistance Act 42 USC 11302(a).

[7] 38 C.F.R. § 61.33(a)(1)(ii)

[8] 38 C.F.R. § 61 et seq.

38. The VA paid the Defendants to effectively 'warehouse' the Plaintiff where he could receive medical treatment at the nearby Tomball VA and Alexander Chiropractic clinics while the VA processed his claim for disability.

**Obligations as Recipient of Federal Funds**

39. Receipt of federal funds makes a party subject to Section 504 of the Rehabilitation Act of 1973, as amended, and the Americans with Disabilities Act, as amended.

40. The Defendants receive millions of dollars per year in federal funds via contracts and grants from the VA.

**Confiscation of Kitchen Cutlery and Impacts on Plaintiff's Diet**

41. On January 21, 2024, Plaintiff submitted a "Concern Slip" to an on-duty Veterans Service Assistant ("VSA") expressing his concern about the nutritional content of the food being served and his medical condition having undergone the gastric bypass surgery. *See Exh.* 11.

42. Many times, the food served to the Plaintiff by the Defendants was insufficient in its nutritional value, meaning the balance of starches to proteins was too high, or the food is not consumable due to its form and the utensils necessary to consume it were not made available to the Plaintiff.

43. On January 24, 2024, Plaintiff learned he had no expectation of privacy when his room and possessions were inspected by Calvin Jackson ("Jackson"), Necole Foreman ("Foreman"), and a third USVI employee under Jackson and Foreman's supervision. Therein, a three-inch (3") paring knife, traditional cutlery found in almost all kitchens, was confiscated by Foreman.

44. The Plaintiff showed Jackson and Foreman an *à la carte* whole meatloaf purchased from Boston Market, stored in his refrigerator, and with proof of purchase from the previous night. This food was part of his self-accommodation to his Diet, and the knife was necessary for the preparation of his food. Foreman ignored the Plaintiff's explanation and declared the kitchen cutlery was a weapon; thus, it was confiscated.

45. Later, on January 24, 2024, Plaintiff sent an email to Jackson (CJackson@usvets.org), Foreman (NForeman@usvets.org), David Traxler ("Traxler") (DTraxler@usvets.org) U.S. Vets local executive director, and the Plaintiff's then-case manager, Rose Lawson (rlawson@usvets.org), demanding the Defendants return the cutlery the confiscated. *See Exh.* 5; *see also Exh.* 6 (Attachment to *Exh.* 5)

46. The beginning of the email read:

> "Necole and Calvin,
>
> Before you get all the information on Narcan being an Over The Shelf (OTC) medication, I am first raising the matter with the paring knife you took from my room and your request for documentation from my doctor that I have special dietary requirements. I have attached parts of my VA medical records and Baylor medical records that document undergoing gastric bypass surgery in July of this year (6 months ago) and part of the dietary guidelines for gastric bypass patients. This document is attached herein. If you want to read the entire dietary program, click here.
>
> Necole, you may have noticed the bags of apples, grapes and nectarines in my fridge and on the cabinet. I also had a meatloaf in my fridge that cannot be cut with a plastic knife. I purchased that meatloaf from Boston Market last night after spending $50 on first aid supplies that should have been here, on site, after I fell. …"

47. Attached to that email were excerpts from the Plaintiff's VA Medical Record and documentation of his Diet from his surgeon. *See Exh.* 6 (Attachment to *Exh.* 5)

48. Despite the Plaintiff's repeated requests, accompanied by documentation supporting the Diet, the Defendants refused to return the cutlery.

**Dietary Requirements, Conversion of Disability**

49. Initially, Defendants fell far short of meeting Plaintiff's dietary requirements. An outside vendor catered for meals until the Defendant's on-site kitchen received its permit to operate.

During this period, the Plaintiff made up the difference on his own by preparing leftovers and other foods he purchased privately in his room or turning to soy protein-based "Cliff Bars" or Greek yogurt.

50. Upon the confiscation of the Plaintiff's paring knife, Defendants converted what was a self-accommodating measure taken by the Plaintiff to eat properly and transformed it into an actual disability where the Plaintiff would be forced to rely on the Defendants to make reasonable accommodation available to him.

51. A person who has undergone Gastric Bypass takes risks by eating foods he cannot cut into small enough pieces. On at least 6 occasions, the Plaintiff regurgitated foods served by the Defendants because he couldn't cut his food into small enough pieces. This scenario can lead to gastrointestinal blockage.

52. Because the Defendant did not grant the Plaintiff a reasonable accommodation, he had to rely on eating side dishes or foods containing simpler starches, e.g. mashed potatoes, soups, or skipping meals altogether, relying on these foods that were easier to eat resulted in some malnutrition because he could not consume enough protein when he was fighting the effects of muscle atrophy because of the Leg Paralysis.

**Risk of Homelessness vs Reward for Self-Accommodation**

53. The Plaintiff repeatedly sought alternative courses of action to avoid this lawsuit, even weighing the risks of hiding another kitchen knife in his room that he could use, versus risking homelessness if a replacement knife were discovered therein.

54. If another knife were discovered, Plaintiff would be subject to "IMMEDIATE discharge" or eviction from his residence at the Veteran's Village, again becoming homeless under the guise of Defendant's "No Weapons Policy". *See Exh.* 8 P.1, No.4.

55. The Plaintiff does not have a criminal record nor is he a violent person.

**Rarely Reasonable Accommodations Were Made**

56. The Plaintiff was at the Veterans Village for 91 days.

57. An outside company catered meals for 21 to 28 of the 91 days. The Plaintiff self-accommodated until the kitchen paring knife was confiscated.

58. In the rare instances the Defendants made a reasonable accommodation available, it was the exception, not the rule.

59. The plaintiff was allowed to pre-prepare breakfast on three occasions by the Defendant's head chef. The meals were planned out in 10-day blocks by Plaintiff and prepared by Plaintiff, using his containers and Defendant's kitchen cutlery while in Defendant's kitchen. The pre-prepared meals contained fruit, typically mangos, strawberries, and pineapple, with granola, Greek yogurt, and cottage cheese. These foods were purchased and prepared by the Plaintiff. Defendant's head chef supplied contributed two pineapples, and Greek yogurt to Plaintiff for 20 days.

60. The Plaintiff was able to pre-prepare an estimated 30 breakfast meals on those three occasions in the kitchen and under the head chef's supervision.

61. For those 60 to 70 days when Defendant's kitchen was in operation, 180 to 210 meals were prepared.

62. Plaintiff was allowed access to Defendant's kitchen only once (1) To cut his food into small enough pieces to consume on March 31, 2024. *See Exh*. 13.

**Complaints Re Burglary and Defendant's Failures to Prevent Crime**

63. On February 24, 2024, Plaintiff's truck was burglarized.

64. Plaintiff asked Defendants to review the video captured by the Tunnel to Towers security cameras. Multiple employees stated they did not see anything in the footage.

65. On February 25, 2024, Plaintiff sent Traxler, Foreman, DeLorenzo, and Swann an email citing that security was not performing their job. *See Exh*. 16.

66. Certain the camera system captured the burglary, Plaintiff asked Kim DeLorenzo ("DeLorenzo"), the on-site manager employed by Tunnel to Towers, to review the footage.

DeLorenzo stated that she and her staff from Tunnel to Towers in New York reviewed the footage and did not see any evidence of a crime.

67. Still certain the system captured the crime; the Plaintiff asked a Defendant's employee[9] for a copy of the security camera video. That employee granted the Plaintiff's request and copied that information onto a thumb drive card owned by the Plaintiff.

68. The Plaintiff reviewed the security camera footage and immediately found the burglary. The video showed where the security company employee did nothing to identify, intervene, attempt to apprehend the burglar, notify the Defendants of what he witnessed, or call the police for help.

69. Several days later, the Plaintiff, a Commercial UAS pilot licensed by the FAA, used one of his aircraft, *see Exh.* 26, to find the security company was not patrolling the Veterans Village. The Plaintiff used the aircraft's onboard camera to navigate where the security patrol was parked on the opposite side of the Veterans Village. Then, while flying over the adjacent tract of land, the Plaintiff descended and recorded the guard not patrolling, sleeping in the car. The guard did not awaken or see when the aircraft's strobe landing lights were remotely activated by the Plaintiff. The Veterans Village is not within Class D or controlled airspace. *See Exh.* 29, 30, 31.

70. On March 5, 2024, the Plaintiff privately published both the burglary video, and the footage recorded from the drone the video to YouTube[10]. Therein, the video displays the source timecode from the Tunnel to Towers security camera system provided by the Defendant's employee. Also included in that video is the footage captured by the Plaintiff's aircraft of the guard sleeping in his car.

71. The video is accessible only to those with the link or URL address. The public is not able to search for and discover the video.

---

[9] The name of the Defendant's employee will remain unidentified at this time until the court can determine what protections can be afforded that employee from retaliation by the Defendants.

[10] *See* https://www.youtube.com/watch?v=vqHmcSyvjPw

72. On February 29, 2024, having received replacement parts to fix the truck door, Plaintiff emailed Juntre Francis, his case manager employed by the Defendants, stating he would be offsite overnight trying to repair his vehicle. *See Exh.* 17 *see* also *Exh.* 18 (Attach Exh. 17). The Defendants were not able to bill the VA for the two nights the Plaintiff was offsite (2 nights X est. $69 = $138).

73. The Plaintiff emailed Larry Swann ("Swann"), his VA Liaison, describing the lax security and concerns that someone could get hurt intervening because the security patrol did not do their job. *See Exh.* 28.

74. All footage of the security guard's failure to patrol was captured by a licensed aircraft operated by an FAA-licensed pilot. *See Exh.* 4; *see also Exh.* 26.

75. All footage gathered by Plaintiff regarding the burglary or shortcomings of the security patrol was in public view, able to be seen by anyone walking on the public sidewalk or standing at the front desk of the Veterans Village where the VSAs work.

76. At no time did the Plaintiff put any video camera in his room or in the window of his room to record any activity. Even if the Plaintiff did put a camera within his room, his domicile, and it would be for his protection and not in violation of any rules; however, he did not.

**Efforts Towards an Alternative Resolution**

77. On at least 4 occasions, Plaintiff volunteered 4 or more hours of his time and skills in Defendant's kitchen facilities to help cook meals for the community and gain familiarity with the kitchen policies and procedures under the Defendants supervision.

78. The Plaintiff repeatedly requested that he be allowed to access the kitchen facilities under Defendant's control where can safely prepare his food, giving him access to its utensils, including metal forks, spoons, and knives to pre-prepare meals stored in his dorm-sized refrigerator or request for a knife to alter the form of the food served to him, thus reducing the risk of gastric blockage or regurgitation.

79. The Plaintiff was willing to obtain a food handler's permit if the Defendants could cover the costs for the class and test online.

80. The Plaintiff was only able to use the kitchen under the supervision of the head chef on three occasions. Each time The Plaintiff asked Dwayne Douglas ("Douglas"), the assistant chef, for access to kitchen utensils or to use non-plastic silverware, his request was denied.

**Meeting for Attempted Resolution**

81. On the evening of March 28, 2024, after Plaintiff was again denied access to the kitchen, Plaintiff emailed Darryl J. Vincent, MSW, CSAC, the Defendant's Chief Operating Officer, Foreman, the Defendant's "Veterans Service Manager", Traxler, the Defendant's "Executive Director" and Larry Swann, the VA's GPD Program Liaison to the Defendants, with the subject line: "Formal Complaint - Access to food and food preparation.". In the email, the Plaintiff demanded that the Defendant remedy the problem, stating that they had not made reasonable accommodations and expressing that they were no longer willing to compromise. *See Exh.* 9

82. On April 2, 2024, in a meeting called by Swann, the Plaintiff met with Juntre Francis ("Francis"), his "Case Worker", Karen Jones ("Jones"), the "Transitional Housing Coordinator", and an unidentified VA employee in Jone's office. During the meeting, Plaintiff and Swann specifically discussed the request for reasonable accommodation with Jones, emphasizing the need for accommodations such as access to utensils to prepare Plaintiff's food or permission for Plaintiff to have cutlery in his room. Jones outright refused to allow the Plaintiff to possess any kitchen cutlery in his room as a solution.

83. The Plaintiff agreed to allow the Defendants time to discuss a potential remedy; however, when the Plaintiff asked Jones for some sort of a deadline when it would be addressed, Jones refused to agree to a deadline when it would be addressed.

84. The Plaintiff and Swann also told Jones the Plaintiff was under the care of a VA psychiatrist and community care licensed professional counselor, undergoing PT and chiropractic treatments on a weekly to twice weekly basis.

85. In response to Jones's refusal, and at the end of the meeting, Plaintiff handed Jones his iPad displaying an early draft of Plaintiff's Original Petition (*see* Dkt. 1) that was ultimately filed with this court. The Plaintiff explained to Jones that he would seek a judicial remedy if reasonable accommodation was not provided. This was the first warning by the Plaintiff he would seek a judicial remedy.

86. Plaintiff thanked Swann for his attempts at intervention on his behalf immediately after the meeting via email with the draft of the complaint attached. *See Exh.* 25.

87. Again, after the meeting, Plaintiff sent Francis an email re-requesting the form to fill out with his nutritional requirements, similar to one he previously received and returned to the Defendants. *See* Exh. 10. Francis brought the form to the Plaintiffs room, where the Plaintiff received and returned to Francis a completed form detailing his dietary requirements. Again, Plaintiff attached to the form the documentation of the Gastric Bypass and the Diet requirements sent to the Defendants on January 24, 2024. *See Exh.* 6

**Inedible Food, Final Refusal to Provide Accommodation**

88. On April 1, 2024, Cowboys 4 Heros[11], @cowboysforheros[12], donated 300 pounds of prime steaks to the Defendants to be served to the residents. *See Exh.* 12.

89. The Plaintiff can eat cuts of red meat; however, it requires the pieces be cut into dime-sized bites to consume. The more the meat is cooked, the more the bites need to be cut into smaller sizes for safe digestion. This accommodation was made to the Plaintiff by the head chef on March 31st, 2024, and the Plaintiff was extremely grateful. The Plaintiff consumed the steak dinner over two days. *See Exh.* 13.

---

[11] https://www.cowboys4heroes.com/

[12] https://www.instagram.com/p/C5G6qzepBHA/

90. Defendant's employee, Dwayne Douglas ("Douglas") is the assistant chef. On April 4, 2024, Douglas served Plaintiff a steak that was deep fried, well done, and too tough to cut with plastic cutlery. The Plaintiff asked Douglas for access to a sharp knife three times and Douglas refused each time. Douglas is familiar with the Plaintiff's medical condition and the requirements of his Diet.

91. Francis, the Plaintiff's Case Manager, was nearby when Douglas denied Plaintiff's request. Francis was present in the April 2, 2024, meeting with Jones, Swann, and the Plaintiff. The Plaintiff asked for Francis's intervention on his behalf to ask Douglas for a knife capable of cutting the steak; however, Francis's request was also denied by Douglas. Douglas stated to the effect, 'he can use the plastic utensils in the dining room'. The Plaintiff told Francis the situation was unacceptable, and he would pursue a legal remedy. This was the second warning to the Defendants that the Plaintiff would seek a judicial remedy.

92. Plaintiff took the deep-fried steak to his truck in the parking lot, retrieved a pocketknife from the cab, and while sitting on the tailgate of his truck, he ate the steak using the plastic fork, styrofoam plate, and pocketknife. *See Exh* 14..

**Laurence Taylor, LPC, CDC**

93. Lawrence Taylor ("Taylor") is employed by the Defendants and his job title is "Director of Behavioral Health". The staff addresses Taylor as "Doctor Taylor".

94. In Taylor's[13] LinkedIn profile, he labels himself as an "ASTUTE CLINICAL SUPERVISOR", having been awarded a B.A. in Criminal Justice, M.Ed. Education, Ph.D. Counselor Education/School Counseling and Guidance Services.

**Arrest Witnessed**

---

[13] *See* link: https://www.linkedin.com/in/dr-lawrence-taylor/, Dr. Lawrence Taylor, LPC-S, LCDC, CSC (He/Him) "ASTUTE CLINICAL SUPERVISOR", Director of Behavioral Health, US Vets, BA Criminal Justice, MEd Education, Ph.D. Counselor Education/School Counseling and Guidance Services

95. On April 8, 2024, after 10 pm, Plaintiff was awakened by Police and thought to be banging on his door. When he opened his door, he witnessed, at a very close distance, less than 5 feet away, the arrest of his next-door neighbor ("The Neighbor") in room 362.

96. The Plaintiff recognized the 5-person team of Houston Police officers as members of the SWAT or Violent Offenders Unit based on their use of barricade shields and weapons drawn when conducting the arrest.

97. After the arrest, in the interest of his safety first and foremost, the Plaintiff used his Harris County District Clerk's login credentials to inquire about the nature of the crime The Neighbor was accused of committing.

98. The Neighbor was charged with two counts of bodily injury to two children, one of them was not his child. In the first count, he was accused of repeatedly striking a four (4) year-old child. In the second count, he was accused of grabbing a twelve (12) Year old child by the throat.

99. Upon Plaintiff's review, he became concerned for his safety, then his concern extended to the safety of other residents in the Veterans Village. Third and finally, the Plaintiff was concerned about The Neighbor's well-being, if he would be released, would he need any crisis counseling provided by one of the Defendant's licensed counselors.

100. Plaintiff printed and gave the charging documents exclusively to Darryll Charles ("Charles"), a Veterans Service Assistant ("VSA"), and an employee of the Defendants. *See Exh.* 15.

101. A VSA's role is analogous to a hotel concierge. The Plaintiff shared what he witnessed and read in the charging documents with only one of the Defendant's employees, Charles. The Plaintiff stated to Charles, "I think this is something Dr. Taylor will want to see.". Upon Charles's review, he stated, "I agree.

**Public Information**

102. The Neighbor's arrest was not conducted in a clinical setting, but in a common hallway after 10 pm.

103. The information gathered from the Harris County District Clerk's records, via the web, using the Plaintiff's login granted to him by the clerk of the court is public information.

104. The login credentials were established long ago and used by the Plaintiff in work he performs for Thomas P. Nixon, a Houston attorney.

105. Any person may apply for and automatically be granted access to that same information.

**Plaintiff's Four Warnings he would seek a Judicial Remedy**

106. On April 2, 2024, Plaintiff notified Jones he would seek a Judicial remedy at the close of the meeting where Swann, Francis, and Jones were present. This was the first (1st) warning from the Plaintiff to the Defendants that he would seek a judicial remedy if a reasonable accommodation was not provided for due his disability.

107. On April 4, 2024, Plaintiff told Francis he would seek a Judicial remedy because Douglas refused Plaintiff's request three times to use a knife to cut his food and refused Defendant's employee (Francis), effort to intervene on Plaintiff's behalf. This was the second (2nd) warning from the Plaintiff to the Defendants.

108. On the Thursday before filing this lawsuit, in Francis's office, Plaintiff told Swann and Francis he would file this petition the following Monday. The plaintiff gave Swann a draft copy of the pleadings. This was the third (3rd) warning from the Plaintiff to the Defendants.

109. When Plaintiff signed out of the Veterans Village on April 15, 2024, he logged the 'courthouse' among his destinations when signing out of the Veterans Village. This was the fourth (4th) warning from the Plaintiff to the Defendants.

**Retaliation by the Defendants for Seeking Judicial Remedy**

110. On April 15, 2024, at 9:58 am, Plaintiff filed "Plaintiff's Original Petition for Injunctive Relief and Declaratory Judgment", (*see* Dkt. 1-1, see TxSD Case 4:24-mc-00575). *See Exh.* 32.

111. The Plaintiff's Original Petition was entered and filed with this court's clerk on "4/15/2024 at 9:58 AM CDT".

112. Case 4:24-mc-00575 was converted to Case No. is 4:24-cv-01553[14], revised for the miscellaneous action in Plaintiff's Motion to Proceed In *Forma Pauperis*. This order on the Motion to Proceed was signed by Hon. Lee H. Rosenthal, April 25, 2024.

113. Upon returning to the Veterans Village from the Federal Courthouse, the Plaintiff was called by Junte Francis, his case manager, and asked to meet with Taylor in Taylor's office.

114. This is the first and only time Plaintiff and Taylor met behind a closed door; however, also attending the meeting was Karen Jones.

115. Therein, Taylor told the Plaintiff he was being "discharged" from GPD Program, effectively evicted from the Veterans Village.

116. At that point, Plaintiff stopped Taylor and handed Taylor a copy of the pleadings filed that morning. Plaintiff warned Taylor such action would in the eyes of the court or a jury, be interpreted as a form of retaliation and urged Taylor to speak to an attorney before taking such action before finalizing any action.

117. Taylor said the Defendant's in-house legal counsel, Carla Ford ("Ford"), had been made aware of the situation. Taylor also named Ford as the Defendant's corporate counsel in the discharge letter given to the Plaintiff on April 15, 2024. *See Exh.* 33.

118. Taylor continued in the letter *Id.*, that the Plaintiff's "discharge" was "due to violating U.S. Vets – Personal Rights Policy", and that Plaintiff was "…engaging in this dissemination of the client's personal criminal information…"[15]. *Id., see* also *Exh.* 34.

119. The Plaintiff explained the information was publicly available and was inquired into based on the witnessed arrest. Plaintiff added the information was not "disseminated", but

---

[14] Judge Lee Rosenthal granted the "Motion to Proceed In Forma Pauperis", on April 25, 2024. See Misc Action No H-24-575.

[15] "Disseminate": Derived from the Latin semen, a seed, it is defined by Webster as "*to sow broadcast or as seed*," and, carrying the metaphor farther, "*as principles and ideas are disseminated when they are spread abroad by propagation.*" The word creates the same picture as "*broadcast*," which Webster defines as "*to disseminate widely*," and whose present popular meaning is identified with radio, which disseminates information to the four corners of the earth.; *see* also *Norman* v. *Las Vegas*, 177 P.2d 442, 450 (Nev. 1947).

transmitted to Taylor, via Charles, the Defendant's employee. Taylor replied that the Plaintiff's "*mere inquiry*" into that public information was a violation of Defendant's "Personal Rights Policy" and called for the Plaintiff's immediate discharge.

120. Taylor was awarded a Bachelor of Art in Criminal Justice, from Sam Houston State University.

121. Taylor's letter reads, "Upon seeking counsel from the Veteran's Administration Liaisons as well as General Counsel from U.S. VETs Attorney, Carla Ford, U.S. VETS – Houston is discharging you from the Grant Per Diem Program.". *Id.*

122. The letter is signed by Taylor and the Defendant's executive director in Houston, David Traxler. *See Exh.* 33.

**U.S. VETS "Personal Rights Policy"**

123. In the document with a heading of "Personal Rights Policy", *see Exh.* 34, the lead paragraph, titled "Purpose" reads:

*124.* "The purpose of the Personal Rights Policy is to outline and protect the personal rights of clients participating in U.S. VETS programs and to promote a safe secure living environment in which every client is treated with dignity and respect."

125. Under "Policy" it continues, "It is the policy of U.S. VETS to ensure clients receiving services shall have rights which include, but are not limited to the following:"

   a. "Confidentiality of information in accordance with HIPAA and applicable client-therapist standards.";

   b. "To be met with professionalism, dignity and respect when interacting with staff members or other individuals providing services on site.";

   c. "To be provided safe accommodations to meet their needs.";

   d. "Freedom from verbal, emotional, physical and sexual abuse.";

   e. "Freedom from financial or other exploitation, retaliation, humiliation, and neglect.";

   f. "To be informed by the program of the procedures to file a grievance and/or appeal discharge (see Grievance Policy).";

g.  "To be free from discrimination based on ethnic group identification, race, religion, age, sex, color disability, and all other protected classes according to state and federal law.";

h.  "Access to information pertinent to the client in sufficient time to facilitate their decision making.";

i.  "Access to personal client file records and required by applicable law."; and

j.  "To be free to attend religions services or activities of their choice. Participation in religious services will be voluntary only.".

126.  Under the heading of "Procedures", it reads, "If a client feels they have not been treated with dignity and respect, or that their rights have been violated, there is recourse to report such violations.", and "If a client wishes to report a violation and/or infringement of personal rights, a grievance form may be obtained from any staff member, or complaints can be directed to the Executive Director. Please see U.S. VETS Grievance Policy for further guidance.".

127.  On the second page 2 (VETERAN 00082), it repeats the same list of items, and adds under the heading "Complaints", that complaints can be directed to: Attn: Executive Director".

128.  Both pages read at the bottom of the page, "Personal Rights Policy 11.01.20" and both pages read, "Page 1".

129.  All covenants of the "Personal Rights Policy" prescribe the Defendant's duty of care owed to the Plaintiff.

130.  In the Acknowledgement portion of the policy, it reads, "I have been personally advised and have received a copy of my personal rights and have been informed of the provisions for complaints as of the date of this signing.".

131.  "The Director of Behavioral Health and/or Program Manager are responsible for ensuring that the Personal Rights policy and procedures are implemented, monitored, and regularly reviewed.". *Id.*

132.  The Defendants owe all duties listed therein to the Plaintiff. The Plaintiff is the sole beneficiary of the "Personal Rights Policy" and the contract is effectively unilateral.

**Clinical Malpractice**

133. The Plaintiff has two mental health professionals. 1. A psychiatrist at the Houston VA; and 2. A Licensed Professional Counselor at Renewing Hope in Houston.

134. Between January 17 and January 31, 2024, Taylor spoke to the Plaintiff in a public setting, without any expectation of privacy on the Plaintiff's part, about 'sitting down' with a therapist. Taylor added that the Plaintiff had to take part in at least two hours of therapy. The Plaintiff told Taylor he has mental health services provided by a VA psychiatrist and a Licensed Professional Counselor. Taylor urged the Plaintiff to reconsider, and the Plaintiff re-declined Taylor's offer.

135. The Texas State Board of Examiners of Professional Counselors oversees Taylor's professional conduct.

136. The Grant Per Diem Program Participant Handbook requires a program participant to "[a]ttend at a minimum 2 Sessions with an Onsite Therapist.". *See Exh.* 38 p.2.

137. The Defendants told the Plaintiff he would have to attend "group therapy" four times if he wanted to exit Phase One of the GPD Program. *See Exh.* 23; *see also Exh.* 24.

138. The Defendants forced the Plaintiff's participation in Group Therapy and that is a violation of state laws[16] that protect mental health patients from predatory practices.

139. The Defendants are financially incentivized to force the Plaintiff's participation in its group therapy.

**Texas LPC Code of Ethics**

---

[16] 22 Tex. Admin. Code § 681.38(e) (2023, 48 Tex. Reg. 5142) 1. Regarding "Conflicts, Boundaries, Dual Relationships, and Termination of Relationships", a "**licensee must not knowingly offer or provide counseling to an individual concurrently receiving counseling treatment intervention from another mental health services provider** except with that provider's knowledge. If a licensee learns of such concurrent therapy, the licensee must request release from the client to inform the other professional and strive to establish positive and collaborative professional relationships.".

140. In Texas, as in other states, it is considered inappropriate and unethical for a Licensed Professional Counselor (LPC) to diagnose a mental disorder without having personally evaluated the individual[17]. According to the ethical guidelines and standards set by the Texas State Board of Examiners of Professional Counselors, which operates under the Texas Behavioral Health Executive Council, LPCs are required to adhere to a strict code of conduct that includes conducting appropriate evaluations before making any diagnoses.

141. The American Counseling Association's (ACA) Code of Ethics, which many states including Texas refer to, also specifies that counselors must base their diagnoses on carefully conducted assessments suited to the client's needs. Diagnosing a mental health disorder without proper assessment not only risks harm to the individual by possibly misdiagnosing or failing to diagnose their condition correctly but also undermines the professionalism of the counselor[18]. Diagnosis without evaluation would be considered malpractice if it results in harm to the client. Malpractice in the context of counseling typically involves a breach of duty of care that results in harm. Not evaluating a client properly before diagnosing would be considered a breach of that duty.

142. Rule C. 5. Of the American Counseling Association's Ethics Manual requires that "[c]ounselors do not condone or engage in discrimination against prospective or current clients, students, employees, supervisees, or research participants based on age, culture, disability, ethnicity, race, religion/spirituality, gender, gender identity, sexual orientation,

---

[17] Texas Admin Code §681.41 (h)A licensee must not evaluate any individual's mental, emotional, or behavioral condition unless the licensee has personally interviewed the individual or the licensee discloses in the evaluation the licensee has not personally interviewed the individual.

[18] American Counseling Association Code of Ethics, Section E, titled "Evaluation, Assessment, and Interpretation", Rule E.5.a, "*Proper Diagnosis Counselors take special care to provide proper diagnosis of mental disorders. Assessment techniques (including personal interviews) used to determine client care (e.g., locus of treatment, type of treatment, recommended follow-up) are carefully selected and appropriately used.*"

marital/partnership status, language preference, socioeconomic status, immigration status, or any basis proscribed by law."

## TRO

143. When the Defendants retaliated against the Plaintiff by "discharging" him from the GPD Program, Plaintiff did not have access to the ancillary courts of the Texas Southern District in an attempt to stay the "discharge", Plaintiff sought emergency relief in the Harris County District Court.

144. Present in the hearing via Zoom where the Defendant's legal counsel, including Ford and Taylor.

145. Defendant's counsel represented to that court that Plaintiff was Dr. Taylor's "patient", and he was "discharged" from a program where he was receiving care like any patient admitted into a hospital.

146. The ancillary judge denied the Plaintiff's application for emergency relief and the Plaintiff became homeless again.

## HIPAA

147. Under the Health Insurance Portability and Accountability Act ("HIPAA"), clinicians, administrative personnel, and insurance companies owe duties of privacy to the patients. Patients do not have a duty to any clinician under HIPAA.

148. The Texas State Board of Examiners of Psychologists, the Texas State Board of Examiners of Professional Counselors, the Texas State Board of Social Worker Examiners, and the Texas State Board of Examiners of Marriage and Family Therapists hold the clinician responsible for protecting a client's privacy.

149. Taylor, as a "Licensee", must "keep patients/clients informed of all changes in circumstances affecting confidentiality as they arise.". Taylor did not disclose to The Neighbor that a "breach of privacy" occurred as required by federal law 45 C.F.R. §§ 164.400-414.

150. On April 21, 2024, when removing his property from the Veterans Village, the Plaintiff was asked by The Neighbor why he was moving out. The Neighbor then stated he was not aware of the Plaintiff's discharge and he was not told about a breach of his privacy had taken place. The Neighbor added he did not feel aggrieved in the matter and he would speak with Taylor on the Plaintiff's behalf.

151. The Plaintiff urged The Neighbor not to intervene and the Plaintiff's rationale for urging him not to intervene was because 1. Taylor did not disclose to The Neighbor that any breach of his privacy had taken place; 2. Fearing for The Neighbor's well-being that if Taylor retaliated for the Plaintiff asserting his civil rights in court, Taylor would not have a problem evicting The Neighbor to put distance between the Defendants and The Neighbor, making it hard for the Plaintiff to prosecute this civil suit.

152. Taylor made a false statement of fact by using the pretext of a privacy violation, that occurred one week before his "discharge" as the cause for the Plaintiff's immediate discharge.

153. There is no provision in the "Personal Rights Policy" that holds the Plaintiff to any duty of privacy or confidentiality.  In the "Personal Rights Policy", all provisions bind the Defendants with duties owed to the Plaintiff. The Defendants believe the Plaintiff is legally bound under HIPAA and the Defendant's "Personal Rights Policy" to respect the privacy of a third party; however, the Plaintiff is not obligated to anyone under HIPAA because the Plaintiff is not a clinician. *See Exh.* 34 at #1 on p.1 & at #1 on p.2.

154. There is no privity of contract between The Neighbor and Plaintiff because The Neighbor is not named as a party to any contract the Plaintiff might or might not have signed. Furthermore, there is no mention of a duty to any third party in the "Personal Rights Policy".

155. The Plaintiff is also required to know the "applicable client-therapist standards.", which are not defined in the "Personal Rights Policy" or disclosed to the Plaintiff.

156. In the Veterans Village, some residents do not participate in the GPD Program and are merely residents paying rent to live there. If the Plaintiff did have a duty to anyone else, he would not know whom the duty was owed.

157. Defendant's stated reason for discharging Plaintiff was for violating The Neighbor's privacy. *See Exh.* 33.

158. The information in the charging documents was public information and not disseminated but transmitted to Taylor via Charles. Charles will be called to testify at trial.

**Defendant's Breach of Contract, Disregard for Plaintiff's Due Process Rights and Grievance Procedures**

159. In the Grievance Policy, under the heading "Purpose", it reads, "It is facilitated through individuals who are familiar with homeless populations, program rules, and grievance resolution policies and procedures.". *See Exh.* 36.

*160.* Under the heading "Policy" it reads, "It is the policy of U.S.VETS that an avenue be given to program clients to address programmatic concerns in order to seek a resolution without threat of retaliation.". It goes on, "A grievance is defined as a complaint or dispute made by a client(s) regarding dissatisfaction with disciplinary actions (*e.g.* progression of discipline, discharge from the program), dissatisfaction with services received or alleged violation of client rights. *Id.*

161. Under the heading, "Procedure", it reads that a participant's due process rights include an appeal process, which the Defendants did not afford the Plaintiff, and that the grievance will be "addressed face to face with the grievant". *Id.*

162. In both the discharge letter and in the meeting, Taylor accused the Plaintiff of violating The Neighbor's privacy on April 8th, 2024; however, in the six days between April 8, 2024, and April 14, 2024, Taylor took no administrative action to correct the Plaintiff's actions he represents as so serious to warrant the Plaintiff's immediate discharge.

163. Taylor's stated reason for discharging the Plaintiff was a violation of a rule that does not exist nor is it one (1) of the nineteen (19) Violations listed in "Client Rules and Regulations" that would subject a person to "IMMEDIATE discharge", *See* Exh. 35, *see also* Exh. 33.

164. The Neighbor took offense to Taylor's actions against the Plaintiff.

165. The Neighbor did not file a grievance against the Plaintiff.

166. The Neighbor was not notified of a PHI breach.

167. Alternatively, in a scenario where Taylor may be out of town, and if the violations were serious enough to warrant the Plaintiff's immediate discharge, Traxler, the executive director of U.S. Vets in Houston (co-signer of the discharge letter), or David Palmer, the Defendant's Program Director, could have investigated and made a determination to discharge the Plaintiff.

168. In the "Grant Per Diem Program, Participant Handbook", a section on page 5 below the heading "Incentives and Sanctions", reads:

> "Non-compliance with programming will result in consequences, leading up to and including discharging from the program. Behavioral contracts are utilized after barriers are identified and non-compliance continues."

169. Plaintiff was never given a "Behavioral contract" or a "Sanction" due to any "non-compliance".

170. On April 2, 2024, Swann told Jones the Plaintiff was receiving outside care for the paralysis of his left leg at the VA, and through a community care provider.  Swann and the Plaintiff added Plaintiff receives mental health services from the VA. Swann, as the VA Liaison, has the authority to prescribe that the Plaintiff does not have to participate in "programming".

171. The "Personal Rights Policy" reads that a client is "[T]o be informed by the program of the procedures to file a grievance and/or appeal discharge.".

172. In the April 15, 2024, meeting with Taylor, the Plaintiff was not even asked if he committed the act(s) that formed the basis of his discharge.

173. The Plaintiff was not afforded nor was he informed of his "right" to appeal the discharge in the Grievance Policy. *Id.*

174. Federal regulations[19] require that grant recipients (the Defendants) adopt grievance procedures; however, the Plaintiff was not afforded that personal right to "appeal [the] discharge" by either Taylor or Carla Ford, the Defendant's Corporate Counsel. *See Exh.* 33; *see also Exh.* 41.

175. On April 18, 2024, Plaintiff asked Swann 'Did the Defendants call to ask for approval of his discharge from the Veterans Village'. Swann stated the VA does not determine who is or is not discharged, adding that "*your discharge came across my desk earlier this week*".

**The Defendant's Demands for attending "Programming"**

176. The Defendants demand that GPD Program participants perform tasks while living in the Veterans Village. These tasks are called "Programming" and are conducted in 1-hour blocks throughout the week regardless of whether the activity is desired or medically necessary.

177. Programming includes:

    a. Daily Morning Muster (roll call) at 7 am;

    b. "Workforce" at 8 am, four days per week for job skills development;

    c. "Therapy Group", each weekday to perform Cognitive Behavioral Therapy, or Talk therapy among the participants;

    d. "Cardio Class";

    e. "Let's Move" and "Let's Talk" for staff members, two times each week;

    f. "Life Skills Group" meetings each weekday;

    g. "Check In Group" meetings;

    h. "MDT Meeting (Mandatory)" where all GPD Participants listen to complaints by the leadership, wherein they demand that participants in the GPD program perform programming; and

    i. "Words Matter", "Relapse Prevention", "Warriors Group", "Art Therapy", *etc.* *See Exh.* 40 (GPD Program Schedule of Activities)

---

[19] 38 CFR 18.407(b) ... "*A recipient that employs fifteen or more persons shall adopt grievance procedures that incorporate appropriate due process standards and that provide for the prompt and equitable resolution of complaints alleging any action prohibited by this part.*"

178. When the Participants in the GPD Program attend "Programming" activities, the Defendants bill the VA $8.58 per person per hour of "Programming" under the title of "Service Centers"[20].

179. If a Participant stays in "Phase One", they are required to "Attend 7 am Morning Roll Call – Dining Room", and "Attend 7 pm Last House Roll Call".

180. All GPD Program participants are required to be present in their bed or in their room at 11 pm Sunday through Thursday, and 12:30 am Friday, Saturday, and Sunday.

181. Both Plaintiff and Swann told Jones, in the April 2, 2024, meeting that the Plaintiff was under the VA's care and no mental health treatments were necessary; however, Jones insisted that the Plaintiff conduct "programming" pointing to the blocks on the schedule for "Group Therapy". The Defendants are paid above the Per Diem rate by the VA for each activity the GPD Program participant participates in. Jones is not a clinician and does not have a license to professionally practice any healthcare activities.

**Defendant's Violation of Participant's Privacy – Unclean Hands**

182. The Defendants have violated the privacy of the Plaintiff and others similarly situated who live at the Veterans Village.

183. On more than one occasion, during events conducted at the Veterans Village, the Defendants photographed GPD Participants and posted photos on social media websites. *See Exh.* 37.

184. The Defendants solicit donations from the public and use social media to promote their work serving homeless veterans.

185. Defendants claim Plaintiff violated The Neighbor's privacy while ignoring their duty of privacy owed to the program's participants. At no time did the Plaintiff photograph any participants in the Veterans Village.

**Failure to Make a Reasonable Accommodation**

---

[20] 38 CFR 61.80

186. The Defendants never acted upon the Plaintiff's request that the Defendants make reasonable accommodations available to him. The Defendants never made a reasonable accommodation to Plaintiff upon Larry Swann's, the VA's GPD Program Liaison request at the April 2, 2024, meeting.   Between the April 2, 2024, meeting and when the Defendants discharged the Plaintiff, no reasonable accommodation was made.

## CAUSES OF ACTION
### Preamble – Applicable Laws, Regulations and Case Law
**Definition of Disability**

187. The term "disability" means, with respect to an individual: 1. a physical or mental impairment that substantially limits one or more major life activities of such individual; 2. a record of such an impairment; or 3. Being regarded as having such an impairment. Major life activities and bodily functions for the purpose of the ADA include caring for oneself, walking, and eating.  Digestion is defined as a major bodily function defined by the ADA. *See* 42 U.S.C. § 12102.

**Private Suits**

188. Any person who is being subjected to discrimination on the basis of disability in violation of the ADA or who has reasonable grounds for believing that such person is about to be subjected to discrimination may institute a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order under 28 C.F.R. § 36.501.

**The Americans with Disabilities Act and Section 504 of the Rehabilitation Act**

189. A plaintiff may establish a claim of disability discrimination by presenting direct evidence of discrimination.

190. Although both Title II of the ADA and Section 504 of the Rehabilitation Act prohibit discrimination against qualified individuals with disabilities, "the statutes govern different

entities: the ADA applies only to public entities, including private employers, 42 U.S.C. § 12131(1), whereas the Rehabilitation Act prohibits discrimination in federally funded programs and activities, 29 U.S.C. § 794(a)." *Kemp* v. *Holder*, 610 F.3d 231, 234-35 (5th Cir. 2010). Nonetheless, "[t]he Rehabilitation Act and the ADA are judged under the same legal standards, and the same remedies are available under both Acts." *Id.* (citing *Delano-Pyle* v. *Victoria County, Tex.*, 302 F.3d 567, 574 (5th Cir.2002)).

191. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Likewise, Section 504 of the Rehabilitation Act provides, in relevant part, that "[n]o otherwise qualified individual with a disability in the United States, ... shall solely by reason of hers or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

192. A plaintiff states a claim under Title II of the ADA or Section 504 of the Rehabilitation Act "in the context of a student excluded from an educational program," if he establishes that: (1) he has a qualifying disability; (2) he is qualified to participate in the defendant's program; and (3) he was excluded from the defendant's program due to his disability. *Maples* v. *Univ. of Tex. Med. Branch at Galveston*, 901 F.Supp.2d 874, 879-880 (S.D.Tex.2012), aff'd 524 Fed. Appx. 93 (5th Cir.2013). Similarly applicable to the controversy herein, if the court replaces the word "student" with the word "veteran" and "educational program" with "VA-funded homeless program", the same pattern and applicability to these laws apply.

193. "The only material difference between Title II of the ADA and Section 504 of the Rehabilitation Act lies in their respective causation requirements." *Bennett-Nelson* v. *La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir.2005). Section 504 of the Rehabilitation Act prohibits discrimination "solely by reason of" a person's disability, whereas Title II of the ADA provides that "discrimination need not be the sole reason" for the adverse action or exclusion

but rather "a motivating factor." *Pinkerton* v. *Spellings*, 529 F.3d 513, 516-19 (5th Cir. 2008); see also *Soledad* v. *U.S. Dep't of Treasury*, 304 F.3d 500, 503-04 (5th Cir. 2002). Nevertheless, "[a] plaintiff asserting a private cause of action for violations of the ADA, or the Rehabilitation Act may only recover compensatory damages upon a showing of intentional discrimination." *Delano-Pyle*, 302 F.3d at 574 (citing *Carter* v. *Orleans Parish Pub. Sch.*, 725 F.2d 261, 264 (5th Cir.1984)).

## Title III of the Americans with Disabilities Act, as amended.

194. Title III of the ADA provides that no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation *See* 42 U.S.C. § 12182.

195. In order to be a place of public accommodation, a facility must be operated by a private entity, its operations must affect commerce, and it must fall within one of twelve (12) Categories. The category of social service center establishments includes day care centers, senior citizen centers, homeless shelters, food banks, and halfway houses. *See* 42 U.S.C. § 12181(7)(k); *see also* 28 C.F.R. § 36.104 "Place of public accommodation". The Defendants accept and receive payments for services between Texas and California from the VA and rental payments from those who live in the Veterans Village, thus meeting the "commerce among the states" applicability requirement.

196. The Act provides for enforcement through a private cause of action by any person "who is being subjected to discrimination on the basis of disability in violation of this subchapter or who has reasonable grounds for believing that such person is about to be subjected to discrimination in violation of" the Act's public accommodations provisions.

## Section 504 Applicability

197. Section 504 of the Rehabilitation Act of 1973, 87 Stat. 394, as amended, 29 U.S.C. § 794, prohibits a federally funded program from discriminating against a handicapped individual solely because of his or her handicap. It reads:

> "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service."

198. To establish a Section 504 claim, the following elements typically must be proven:

199. <u>Disability</u>: The plaintiff must have a disability, which is defined under the Act as a physical or mental impairment that substantially limits one or more major life activities. This can also include individuals who have a record of such an impairment or are regarded as having such an impairment.

200. <u>Qualified Individual</u>: The plaintiff must be qualified for the program, activity, or service in question. This means they must meet the essential eligibility requirements for the receipt of services or participation in programs or activities, with or without reasonable accommodations.

201. <u>Receiving Federal Financial Assistance</u>: The entity against which the claim is made must be part of a program or activity receiving federal financial assistance. This can include a wide range of entities such as schools, hospitals, and local governments.

202. <u>Discrimination</u>: The plaintiff must show they were discriminated against by the entity because of their disability. Discrimination can manifest in various forms, including denial of participation, denial of benefits, or provision of unequal benefits or services. It can also involve failure to provide reasonable accommodation necessary to ensure equal access or participation.

203. <u>Adverse Action</u> or <u>Denial of Benefits</u>: There must be an action that adversely affects the plaintiff's ability to enjoy the benefits or services provided by the entity. This could include denial of services, exclusion from programs, or other discriminatory actions.

## COUNT I. DISCRIMINATION IN VIOLATION OF THE PLAINTIFF'S CIVIL RIGHTS UNDER SECTION 504 OF THE REHABILITATION ACT, AS AMENDED

204. The Plaintiff re-alleges all facts in paragraphs 1 through 186 along with the applicable statutory laws and regulations and case laws found in paragraphs 187 through 203 and exhibits attached to this filing as *prima facie* evidence supporting Plaintiff's allegation of Discrimination by the Defendants.

**Protected Class – Disability and Qualifications**

205. The Plaintiff is a disabled veteran, having been rated at 70% disability by the Department of Veterans Affairs ("VA"). Plaintiff suffers from Leg Paralysis that led to his homelessness. Without the means to self-accommodate for the requirements of his Diet, the Plaintiff's second disability is malnutrition.

206. The Plaintiff is a veteran who has served in a combat zone.

207. The Plaintiff was placed in the Defendant's GPD Program by a VA social worker.

**Compliance with Section 504 and Requirements for Receiving Federal Financial Assistance**

208. The Defendants receive millions of dollars per year from the VA under 38 C.F.R. § 61 *et seq.*

209. 38 C.F.R. Part 18 (D) Deals with the enforcement of nondiscrimination on the basis of handicap in programs or activities conducted by the Department of Veterans Affairs. This subpart implements Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination based on disability in programs and activities that receive federal financial assistance or are conducted by any Executive agency.

210. According to the regulation, if non-compliance is detected, the Department of Veterans Affairs must first attempt to achieve voluntary compliance. This involves notifying the recipient of the non-compliance and attempting to resolve the issue through negotiation and voluntary corrective measures. If these efforts fail, then formal enforcement measures may be initiated. The VA's GPD Program Liaison, on more than one occasion, requested that the Defendants become compliant with their obligations under their contract with the VA alongside federal and state of Texas law. While a procedural requirement for the Plaintiff to perform certain steps does not exist, the Plaintiff and the VA gave the Defendants over 60 days to make a reasonable accommodation available. The Plaintiff gave the Defendants four warnings over two weeks that he would seek a judicial remedy if the Defendants did not perform as required.

**Link Between Protected Class and Adverse Action**

211. More than 60 days elapsed since the Plaintiff requested a reasonable accommodation. Both the Plaintiff and the VA's GPD Program Liaison at a meeting made a final request for the Defendants to provide the Plaintiff with a reasonable accommodation. At the conclusion of that meeting, Plaintiff warned the Defendants he would seek a judicial remedy if Defendants failed to perform as required by the grants and contracts they entered into with the VA and as required by federal and state law. Defendants were given four warnings over a two-week period that the Plaintiff would seek a judicial remedy if the reasonable accommodation were not made available.

212. Once the Plaintiff filed his original petition seeking a judicial remedy, the Defendants retaliated.

**Adverse Action**

213. After Plaintiff filed his original petition (Dkt. 1), the Defendants made false statements of fact in person and in writing, accusing Plaintiff of violating rules that do not exist in contracts the Plaintiff did not sign.

214. Defendants added that the violation of that rule requires the Plaintiff to be immediately removed from the GPD Program. That is not one of the reasons why a GPD Program participant may be removed from the program.

215. The Defendants evicted the Plaintiff, calling his removal a "discharge" because: 1. The Plaintiff demanded a reasonable accommodation; and 2. The Plaintiff asserted his civil rights with a protected activity by seeking injunctive relief from this court.

216. Instead of just making the required reasonable accommodation available to the Plaintiff, it was easier to remove him from the program. The Defendants benefit by replacing the Plaintiff with another Veteran not or less physically disabled, and would not demand reasonable accommodations and submit to the Defendant's demands that a person comport with its "programming" activities which the Defendants are financially incentivized to make the participants attend. In the Plaintiff's case, forcing the Plaintiff to participate in the "programming" or group therapy or art therapy they prescribed is expressly prohibited by Texas statutes and regulations.

**Damages and Relief Sought**

217. The Plaintiff was homeless for the first time in his life. This homelessness occurred because of surgical negligence on the part of a surgeon at the Houston VA. The Plaintiff turned to a VA social worker who helps veterans at risk of becoming homeless. In turn, that social worker placed the Plaintiff into the Defendant's program. Upon his arrival, the Defendants worsened Plaintiff's mental state, by removing his ability to self-accommodate for his Diet. Then, when Plaintiff demanded reasonable accommodation, which he had the right to receive, the Defendants violated his civil right by discriminating against Plaintiff by just replacing Plaintiff with another veteran who would not ask for reasonable accommodation. Due to the Defendant's actions and failures to act, Plaintiff is seeking:

   a. Pecuniary Damages in the Amount of $500,000. The Defendants, charged with helping homeless veterans, violated the Plaintiff's civil rights and caused him to become

homeless again in lieu of providing a reasonable accommodation. This action by the Defendants caused the Plaintiff to suffer significant emotional distress at a time when he was suffering from Leg Paralysis, Major Depression Disorder, and extreme financial hardship.

b. <u>Exemplary Damages</u>. Where applicable, Plaintiff seeks economic and noneconomic damages pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code. The Defendants are an organization that receives federal funding from the VA to serve both able-bodied and disabled veterans and the Plaintiff is a disabled veteran. The conduct on the part of the Defendants is particularly egregious and petty; therefore, Plaintiff will seek and deserves an award for exemplary damages.

c. <u>Injunctive Relief.</u> The Plaintiff asks for this court to, 1. Refer this matter to the United States Attorney General, civil rights division, for ongoing oversight to prevent or deter Defendants from violating the civil rights of other veterans that have served their country in the armed forces; 2. Referral to the VA's Office of Inspector General for violation of 38 C.F.R. Part 18 *et seq.*

**Damages Split**

218. The Plaintiff Recognizes the financial award may harm the veterans the program is designed to help. In an effort to offset the burden, the Plaintiff will split any damages awarded in this cause of action in the following manner: 50% to the Plaintiff, 25% with The Warrior's Refuge (Another GPD Program provider), and 25% to the Lone Survivor Foundation, now known as Team Never Quit in the Plaintiff's name.

## COUNT II. FAILURE TO PROVIDE A REASONABLE ACCOMMODATIONS, A VIOLATION OF THE PLAINTIFF'S CIVIL RIGHTS, UNDER THE AMERICANS WITH DISABILITIES ACT AND/OR SECTION 504 OF THE REHABILITATION ACT

219. The Plaintiff re-alleges all facts in paragraphs 1 through 186 along with the applicable statutory laws and regulations and case laws found in paragraphs 187 through 203 and exhibits attached to this filing as *prima facie* evidence supporting Plaintiff's allegation the Defendants Failed to Provide Reasonable Accommodations under the Americans with Disabilities Act, as amended.

220. The Defendants operate a homeless shelter catering to military veterans, paid for with federal funding. Onsite is a food bank open to the use of its residents and participants in the Grant Per Diem Program. Some, not all residents in the Veterans Village, pay rent to live at the Veterans Village.

**Plaintiff is Disabled**

221. The Plaintiff is a disabled veteran, having been rated at 70% disability by the Department of Veterans Affairs ("VA"). Plaintiff suffers from Leg Paralysis that led to his homelessness. Without the means to self-accommodate for the requirements of his Diet, the Plaintiff's second disability is malnutrition. The Plaintiff is not making a claim for a disability related to his Leg Paralysis as the basis of this action.

**Defendants Actions or Failures to Act**

222. The Defendants removed the Plaintiff's means to privately self-accommodate for his dietary requirements. Specifically, the Plaintiff used a kitchen knife, the three-inch paring variety to self-accommodate for his dietary requirements. The Defendants used the pretext that the Plaintiff's kitchen knife was a weapon and not cutlery used to self-accommodate for the prevention of malnutrition. The Defendants believe its policies to prevent the possession of a weapon supersedes a person's right to prevent their malnutrition.

223. Once the Defendants converted the Plaintiff's ability to accommodate for his medical condition, the Defendants either failed or refused to make a reasonable accommodation available to the Plaintiff as requested by the Plaintiff and the VA's GPD Program Liaison.

224. Two weeks elapsed between the VA's GPD Program Liaison's and the Plaintiff's last request for the Defendants to provide a reasonable accommodation before the Plaintiff filed his original petition (see Dkt. 1) seeking injunctive relief from this court.

225. If the Defendants acted upon the Plaintiff's and the VA's demand for a reasonable accommodation there would be no controversy before this court.

226. Defendants actions caused Plaintiff damages.

**Damages and Relief Sought**

227. Along with the Plaintiff's requests for reasonable accommodation, he provided proof to the Defendants of the Dietary requirements prescribed by his surgeon and excerpts from his VA medical records supporting the necessity. In addition to the Plaintiff's request for a reasonable accommodation, the VA's Grant Per Diem Liaison also made multiple requests for the Defendants to provide a reasonable accommodation to the Plaintiff. Relief Sought.

228. Plaintiff was homeless for the first time in his life. This homelessness occurred because of surgical negligence on the part of the VA. The Plaintiff turned to a VA social worker that helps veterans at risk of becoming homeless. In turn, that social worker placed the Plaintiff into the Defendant's program. Upon his arrival, the Defendants worsened Plaintiff's mental state, by removing his ability to self-accommodate for his Diet. Due to the wanting disregard for the Plaintiff's civil rights, the Plaintiff is seeking:

   a. Pecuniary Damages in the Amount of $500,000. The Defendants, charged with helping homeless veterans, violated the Plaintiff's civil rights and caused him to become homeless again in lieu of providing a reasonable accommodation. This action by the Defendants caused the Plaintiff to suffer significant emotional distress at a time when he

was suffering from Leg Paralysis, Major Depression Disorder and extreme financial hardship.

b. <u>Exemplary Damages</u>. Where applicable, Plaintiff seeks economic and noneconomic damages pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code. The Defendants are an organization that receives federal funding from the VA to serve both able-bodied and disabled veterans and the Plaintiff is a disabled veteran. The conduct on the part of the Defendants is particularly egregious and petty; therefore, Plaintiff will seek and deserves an award for exemplary damages.

c. <u>Injunctive Relief.</u> Plaintiff asks for this court to, 1. Refer this matter to the United States Attorney General, civil rights division, for ongoing oversight to prevent or deter Defendants from violating the civil rights of other veterans that has served their country in the armed forces; 2. Referral to the VA's Office of Inspector General for violation of 38 C.F.R. Part 18 *et seq.*.

**Damages Split**

229. The Plaintiff Recognizes the financial award may harm the veterans the program is designed to help. In an effort to offset the burden, the Plaintiff will split any damages awarded in this cause of action in the following manner: 50% to the Plaintiff, 25% with The Warrior's Refuge (Another GPD Program provider) and 25% to the Lone Survivor Foundation, now known as Team Never Quit in the Plaintiff's name.

**COUNT III. RETALIATION, A VIOLATION OF THE
PLAINTIFF'S CIVIL RIGHTS FOR SEEKING A JUDICIAL
REMEDY**

230. Plaintiff re-alleges all facts in paragraphs 1 through 186 along with the applicable statutory laws and regulations and case laws found in paragraphs 187 through 203 and exhibits attached to this filings as *prima facie* evidence supporting Plaintiff's allegation the

Defendant's retaliated against the Plaintiff for performing a protected activity of seeking a judicial remedy.

231. No person shall discriminate against any individual because that individual opposed any unlawful act or practice or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing 42 U.S.C. §12203(a).

232. It is unlawful to coerce, intimidate, threaten, or interfere with anyone in the exercise or enjoyment of, any right granted or protected by 42 U.S.C..

233. No private or public entity shall discriminate against any individual because that individual has opposed any act or practice made unlawful by this part, or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing. No private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of any right. 28 C.F.R. 36.206.

**The Elements for a Claim of Retaliation**

234. To maintain a claim of retaliation under the ADA, a plaintiff must prove that 1. they engaged in protected activity; 2. their employer, or in this case the administrator of a federally funded program, took adverse action them, and 3. The adverse action was only causally connected to their protected activity.

**The Plaintiff was Engaged in a Protected Activity**

235. The Plaintiff is a homeless disabled veteran, participating in the VA's Grant Per Diem Program under 38 C.F.R. § 61 *et seq.* The Plaintiff asserted his rights under the Americans with Disabilities Act to seek and receive a reasonable accommodation. The Defendants are required to provide a reasonable accommodation to the Plaintiff under federal law.

**The Administrator of the Program Took an Adverse Action**

236. The Plaintiff warned the Defendants that he would seek a judicial remedy if the Defendants did not comply with his requests and/or the requests of the VA's GPD Program Liaison as required by state and federal law to accommodate his disability.

**Defendants Adverse Action was Connected to a Protected Activity**

237. After more than 60 days of asking for a reasonable accommodation The Plaintiff warned the Defendants he would seek a judicial remedy if he was not afforded a reasonable accommodation for his disability. The Plaintiff made four warnings in two weeks that he would seek a judicial remedy. Upon filing Plaintiff's Original Petition, the Defendant retaliated against the Plaintiff by "discharging" him under the pretext he violated a rule that does not exist for a duty he does not have or owe to a third party.

**Damages and Relief Sought**

238. Plaintiff was homeless for the first time in his life. When the Plaintiff asserted his civil rights and lawfully requested a judicial remedy, the Defendants retaliated. The Plaintiff warned the Defendants not to retaliate and was told the decision to discharge the Plaintiff was approved by Defendant's legal counsel. The Defendants also made false statements of fact to the effect that the Veterans Administration approved the Plaintiff's discharge. Additionally, when the Plaintiff asked Defendant's corporate counsel to reconsider the facts she declined. Plaintiff, already suffering from Leg Paralysis, major depression disorder and extreme financial hardship, suffered further when Defendants discharged him in retaliation for the protected activity of seeking judicial remedy to correct the Defendant's refusal and/or failure to act upon his and the VA's GPD Program Liaison request for a reasonable accommodation. Due to the disregard for the Plaintiff's civil rights, the Plaintiff is seeking:

   a. Pecuniary Damages in the Amount of $500,000. The Defendants, charged with helping homeless veterans, violated the Plaintiff's civil rights causing him damages in the form

of malnutrition and significant emotional distress at a time when he was suffering from Leg Paralysis, Major Depression Disorder and extreme financial hardship.

b. <u>Exemplary Damages.</u> Where applicable, Plaintiff seeks economic and noneconomic damages pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code. The Defendants are an organization that receives federal funding from the VA to serve both able-bodied and disabled veterans and the Plaintiff is a disabled veteran. The conduct on the part of the Defendants is particularly egregious and petty; therefore, Plaintiff will seek and deserves an award for exemplary damages.

c. <u>Injunctive Relief.</u> Plaintiff asks for this court to 1. Refer this matter to the United States Attorney General, civil rights division, for ongoing oversight to prevent or deter Defendants from violating the civil rights of other veterans; 2. Refer this matter to the VA's Office of Inspector General for violation of 38 C.F.R. Part 18 *et seq.* for consideration for remedial action or possibly debarment.

**Damages Split**

239. The Plaintiff Recognizes the financial award may harm the veterans the program is designed to help. In an effort to offset the burden, the Plaintiff will split any damages awarded in this cause of action in the following manner: 50% to the Plaintiff, 25% with The Warrior's Refuge (Another GPD Program provider) and 25% to the Lone Survivor Foundation, now known as Team Never Quit in the Plaintiff's name.

## COUNT IV. FRAUD

240. Plaintiff re-alleges all facts in paragraphs 1 through 186 along with the applicable statutory laws and regulations and case laws found in paragraphs 187 through 203 and exhibits attached to this filings as *prima facie* evidence supporting Plaintiff's allegation the Defendants committed Fraud against the Plaintiff.

**The Elements of a Cause of Action for Fraud**

241. The elements for fraud are: 1. That a material representation was made; 2. The representation was false; 3. When the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; 4. The speaker made the representation with the intent that the other party should act upon it; 5. The party acted in reliance on the representation; and 5. The party thereby suffered injury. *See In re First Merit Bank, N.A.*, 52 S.W.3d 749, 758.

242. The defendant's acts or omissions are a cause-in-fact if the plaintiff can show, beyond mere conjecture, guess, or speculation, that an act or omission was a substantial factor in bringing about an injury which would not otherwise have occurred. *Prospect High Income Fund, ML CBO IV* v. *Grant Thorton, LLP*, 203 S.W.3d 602, 618 (Tex. App.--Dallas 2006, pet. denied) (citing *Marathon Corp.* v. *Pitzner*, 106 S.W.3d 724, 727 (Tex. 2003)). A plaintiff establishes reliance in a fraud claim by showing that the defendant's acts and representations induced it to either act or refrain from acting, to its detriment. *Id.*

**A Material Representation Was Made**

243. Taylor verbally stated to the Plaintiff in the meeting on April 15, 2024, where Jones was present, and in writing that 1. The Plaintiff was "in direct violation of the client's Personal Rights Policy"; 2. Defendants sought "counsel from the Veteran's Administration Liaisons" (plural); 3. The Plaintiff was "engaging in this dissemination of the client's personal criminal information"; and 4. Not making the Plaintiff's due process rights available to him. These representations were made by Taylor on behalf of the Defendants and with the ascent of Defendants in-house legal counsel to convince the Plaintiff to leave the GPD Program without any consequences to the Defendant.

**The Representation Was False.**

244. The statements by Taylor are not true. First, the Plaintiff was not in violation of the contract signed on January 17, 2024, because the Plaintiff does not have a duty of privacy or

confidence owed to any party, named or unnamed. Therein, the Personal Rights Police reads "Each U.S.VETS client receiving services shall have rights which include but are not limited to the following: 1. Confidentiality of information in accordance with HIPPA and applicable client-therapist standards…". This Policy holds that the Defendants owe a duty to the Plaintiff. 2. Taylor stated the VA's Liaisons (plural) were consulted regarding the discharge of the Plaintiff; however, Swann stated to Plaintiff the VA was not consulted regarding the Plaintiff's discharge and the Defendants have the right to discharge a participant without the VA's input. Finally, 3. Taylor represented verbally and in writing that the Plaintiff was engaging in the "dissemination of" "personal criminal information". Taylor was given this information by the Plaintiff via his agent (Charles), an employee of the Defendant. Also, the information was publicly available information.

**The Speaker Knew it was False or Made it Recklessly Without any Knowledge of the Truth and as a Positive Assertion**

245. The VA's GPD Program Liaison represented to the Plaintiff that the VA was not consulted, and that the VA does not determine if a GPD Program Participant is discharged or not. In the alternative, Taylor's statements the Plaintiff violated a policy he did not sign was false and/or made recklessly without knowledge to the truth as a positive assertion.

246. In the alternative, if Taylor consulted Defendants in-house legal counsel, as he stated verbally and in writing, the Plaintiff's discharge was made in accordance with the "Personal Rights Policy" as interpreted by their legal counsel; therefore, the contract stands on its own before the trier of fact.

247. Taylor made those false statements to make the Plaintiff move out of the Veterans Village.

**The Plaintiff Acted in Reliance on the Representation**

248. The Plaintiff moved out of the Veterans Village and is homeless again.

**The Party Suffered Injury**

249. The Plaintiff, already suffering from Leg Paralysis, depression, and severe financial hardship, was evicted from the Veterans Village after he asserted, for more than 60 days, his right under the federal laws that protect persons with disabilities, that allow him to seek and receive reasonable accommodation for his disability. Then, when the Plaintiff performed the protected activity of seeking a judicial remedy, the Defendants retaliated against him, making the Plaintiff homeless again, relying on friends and family at a time when he needed access to housing and food the most. The "discharge", which is effectively an eviction from the Veterans Village caused the Plaintiff further physical hardship with the leg paralysis and emotional pain and suffering having to rely on friends and family.

**Comparative Fault**

250. The Defendants are greater than fifty percent (50%) responsible for the Plaintiff's damages.

**Damages**

251. The Plaintiff seeks economic and noneconomic damages pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code in the amount of $500,000. The Defendants are an organization that receives federal funding from the VA to serve both able-bodied and disabled veterans and the Plaintiff is a disabled veteran. The conduct on the part of the defendants is particularly egregious and petty; therefore, Plaintiff will seek and deserves an award for exemplary damages in the amount of $500,000.

## <u>COUNT V. BREACH OF CONTRACT</u>

252. The Plaintiff re-alleges all facts in paragraphs 1 through 186 along with the applicable statutory laws and regulations and case laws found in paragraphs 187 through 203 and exhibits attached to this filings as *prima facie* evidence supporting Plaintiff's allegation the Defendant's Breached one of more contracts between the Defendant and the Plaintiff.

**Elements of a Claim for Breach of Contract**

253. The elements of a breach of contract claim are: 1. The existence of a valid contract between plaintiff and defendant; 2. The plaintiff's performance or tender of performance; 3. The defendant's breach of the contract; and 4. The plaintiff's damage as a result of the breach. *Prime Prods., Inc.* v. *S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.--Houston [1st Dist.] 2002, pet. denied).

**Existence of a Valid Contract**

254. On or about January 17, 2024, the Plaintiff entered into a contract with the Defendants, with the heading of the contract that read "Personal Rights Policy". *See Exh.* 34.

255. The stated "Purpose" of the policy was "to outline and protect the personal rights of clients participating in U.S. VETS programs and to promote a safe secure living environment in which every client is treated with dignity and respect.".

256. The contract required that the Defendants owe the following duties to the Plaintiff:

   a. Defendants would protect Plaintiff personal health information, pursuant to HIPAA;

   b. Treat the Plaintiff with "professionalism, dignity and respect";

   c. "Provided safe accommodations" to meet the Plaintiff's needs;

   d. Defendants would not "verbal, emotional, physical" abuse the Plaintiff;

   e. Defendants would not financially exploit the Plaintiff or act in "retaliation" or "humiliation, and neglect" against him;

   f. "To be informed by the program of the procedures to file a grievance and/or appeal";

   g. To be free from discrimination based on ... disability, and all other protected classes according to state and federal law.";

   h. The have/the ability to "[a]ccess to information pertinent to the client in sufficient time to facilitate their decision making.";

   i. Be granted "[a]ccess to personal client file records and required by applicable law."; and

   j. Religious liberties.

257. It also reads that "[i]f a client wishes to report a violation and/or infringement of personal rights, a grievance form may be obtained from any staff member, or complaints can be directed to: Attn: Executive Director"

258. Finally, under the heading "Responsibility/Governance", it holds the "Director of Behavioral Health and/or Program Manager are responsible for ensuring that the Personal Rights policy and procedures are implemented, monitored, and regularly reviewed.".

**Validity of the Contract**

259. The elements of a valid contract are 1. an offer; 2. an acceptance; 3. a meeting of the minds; 4. Each party's consent to the terms; and 5. Execution and delivery of the contract with the intent that it be mutual and binding. *Prime Prods., Inc.* v. *S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.--Houston [1st Dist.] 2002, pet. denied).

260. To establish a valid contract, a plaintiff must prove that the parties agreed on all of the essential terms of the contract and that the essential terms were sufficiently certain so as to define the parties' legal obligations. *See Nickerson* v. *E.I.L. Instruments, Inc.*, 874 S.W.2d 936, 939 (Tex. App.--Houston [1st Dist.] 1994, writ denied). If a contract is so indefinite that a court cannot determine the legal obligations and liabilities of the parties, it is not enforceable. *See T.O. Stanley Boot Co.* v. *Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992); *Moore* v. *Dilworth*, 142 Tex. 538, 542-43, 179 S.W.2d 940, 942 (1944); *Cytogenix, Inc.* v. *Waldroff*, 213 S.W.3d 479, 485 (Tex. App.--Houston [1st Dist.] 2006, pet. denied).

261. There are three contracts involving three counterparties. First, there is a contact between a Veteran and the people of The United States. The definition of a "Veteran" is 1. "someone who has served in the military, whether active duty, retired, reserve, or national guard.", the second is someone "... who, at one point in their life, wrote a blank check made payable to the United States of America for an amount up to and including his or her life". These definitions are attributable to federal law and to Jose N. Harris in "*MI VIDA: A Story of Faith, Hope and Love*".

262. Second, there is a contract between The United States Department of Veterans Affairs and the Defendants to provide shelter and food to veterans the VA determines to be homeless. That contract requires the Defendants to perform and follow all applicable federal and state laws including 38 C.F.R. § 61 *et seq.*.

263. Third, there is a contract between the Plaintiff and the Defendants called a "Personal Rights Policy".

264. The Defendants, under their contract with the VA, received remuneration in the form of grants and fees, and in exchange the Defendants would provide food and shelter to the Plaintiff pursuant to all federal and state laws. In the contract or "Personal Rights Policy", the Defendants owed duties to the Plaintiff to protect his rights as defined in the Policy. The Plaintiff read the terms of the Policy and accepted the terms or "Rights" afforded to him from the Defendants.

265. We have 1. An offer; 2. An agreement the terms; 3. Acceptance by the Plaintiff; and 4. Consent to abide by the terms of the contract by both parties; and 5. Execution and delivery of the contract are binding; therefore, the contract is valid.

**Defendant's Breach of Contract with the Plaintiff**

266. The Defendants owed the following duties to the Plaintiff and breached those duties owed to him:

   a. The Defendants failed to promote a safe secure living environment in which every client is treated with dignity and respect as required in the Personal Rights Policy when they removed his ability to accommodate for his medical condition, they violated his dignity as a human being that was not worthy of eating food with kitchen utensils or allow him to modify the food he was served.

   b. Defendants failed to respect the Plaintiff's rights not to be forced to attend "group therapy" which the Plaintiff did not request, require or need and is in violation of Texas statutes and regulations that prohibit predatory practices by mental health practitioners

by making him attend two times more than the minimum of sessions he was required to attend pursuant to the GPD Program Participant Handbook.

c.  Plaintiff was not "met with professionalism" when the Defendants employee Taylor, discharged the Plaintiff from a program he was entitled to attend by virtue of the Plaintiff's homelessness and having served as a Veteran and placed in that program by the VA. Furthermore, Taylor lied to the Plaintiff to effect his removal from the GPD Program.

d.  The Defendants abused the Plaintiff physically and emotionally by discharging the Plaintiff, effectively evicting him at a time when he needed those services the most.

e.  The Defendants used the Plaintiff for financial purposes. The Defendants required the Plaintiff to attend "Group Therapy" when he did not need therapy. The Defendants violated the laws of the State of Texas that protect patients from predatory practices when they made him attend so that the Defendants could charge the VA for those items in the "service contract".

f.  The Defendants retaliated against the Plaintiff when he asserted his right to receive a reasonable accommodation and his protected activity of seeking a judicial remedy before the courts by retaliating against the Plaintiff. Plaintiff believes the Defendants motivations for this retaliation are because the Defendants could just replace the Plaintiff with another Veteran that was more compliant to their demands and requiring less of any reasonable accommodation.

g.  The Defendants violated their duty to the Plaintiff when it did not afford the Plaintiff any due process of appeal when he was discharged from the GPD Program.

h.  The Defendants owed a duty to allow the Plaintiff "[a]ccess to information pertinent to the client in sufficient time to facilitate their decision making.", if The Neighbor was accused of multiple counts of homicides or jaywalking, the Plaintiff had a right to know about the dangers a neighbor that lives next to him might possess. The Defendants used the Plaintiff's very act of seeking that information to remove him from the Veterans

Village in violation of no rule or covenant of the contracts he signed, as the basis for the Plaintiff's immediate removal.

i.  The Plaintiff made repeated requests for a reasonable accommodation and emailed Traxler, and other managers when there was a problem, as outlined in the Grievance Policy, and the Personal Rights Policy and those requests were ignored at all times. Every time the Plaintiff made a request via email, Traxler was a recipient of that email and every time the request was not answered.

j.  The Defendants retaliated against the Plaintiff for seeking a judicial remedy in violation of the covenants in the Personal Rights Policy after the Defendants failed or refused to make a reasonable accommodation available to the Plaintiff.

k.  The Defendants did not allow the Plaintiff to appeal the discharge from the GPD Program, after discharging the Plaintiff for violating rules that do not exist.

l.  The Defendants discriminated against the Plaintiff by removing him from the GPD Program so the Defendants would not have to make a reasonable accommodation available to the Plaintiff for what was once a medical condition the Defendants turned into an actual disability and then either failed or refused to make available the reasonable accommodation as required by federal law.

267. Based on the foregoing the Defendants breached the contract between the Plaintiff and Defendants multiple times and then discharged him instead of being held accountable before this court.

268. Material Breach by One Party Excuses the Performance of the Other. At no time did the Plaintiff breach a covenant of these contracts and policies; therefore, the Defendants cannot invoke the well-settled principle that a material breach by one party to a contract can excuse the other party from any obligation to perform. *See Mustang Pipeline Co.* v. *Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is

discharged or excused from further performance."). *Williams* v. *Jackson* (Tex. App.-Houston [1st Dist.] Oct. 9, 2008).

**Damages**

269. The Plaintiff suffered further financial hardship along with suffering from emotional pain and suffering due to the Defendants actions, their failures to act, and their retaliation against the Plaintiff for seeking a judicial remedy in violation of the Defendants contracts and policies it signed with the Plaintiff.

270. The covenants of those very Policies and Rules to protect the Plaintiff were willfully breached, causing the Plaintiff damages.

271. The Plaintiff seeks economic and noneconomic damages in the amount of $500,000 pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code. The Defendants are an organization that receives federal funding from the VA to serve both able-bodied and disabled veterans and the Plaintiff is a disabled veteran. The conduct on the part of the Defendants is particularly egregious and petty; therefore, Plaintiff will seek and deserves an award for exemplary damages from a jury at trial.

**Damages Split**

272. The Plaintiff Recognizes the financial award may harm the veterans the program is designed to help. In an effort to offset the burden, the Plaintiff will split any damages awarded in this cause of action in the following manner: 50% to the Plaintiff, 25% with The Warrior's Refuge (Another GPD Program provider) and 25% to the Lone Survivor Foundation, now known as Team Never Quit in the Plaintiff's name.

## COUNT VI. VIOLATION OF 42 U.S.C. § 1983

273. The Plaintiff re-alleges all facts in paragraphs 1 through 186 along with the applicable statutory laws and regulations and case laws found in paragraphs 187 through 203 and

exhibits attached to this filing as *prima facie* evidence supporting Plaintiff's allegation the Defendant's violation of 42 U.S.C. § 1983.

274. The Defendants, stated in the Discharge Letter signed by Taylor and Traxler, *see Exh.* 33, that they sought and received counsel from more than one of the VA's GPD Program Liaisons to determine if they could discharge the Plaintiff from the GPD Program.  The VA placed the Plaintiff in the GPD Program, operated by the Defendants pursuant to 38 C.F.R. § 61 *et seq.*

275. Therein, the discharge letter (*Id.*) and as stated by Taylor in the meeting with the Plaintiff that "[u]pon seeking counsel from the Veteran's Administration Liaisons as well as General Counsel from U.S. VETs Attorney, Carla Ford, U.S. VETS — Houston is discharging you from the Grant and Per Diem Program.".

276. A Defendant's liability can attach under *Monell* v. *Department of Social Services*, 436 U.S. 658 (1978), for even a single decision made by a final policymaker in certain circumstances, regardless of whether or not the action is taken once or repeatedly. *See Pembaur* v. *City of Cincinnati*, 475 U.S. 469, 481, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986). If an authorized policymaker approves a subordinate's decision and the basis for it, such ratification would be chargeable to the party under *Monell*. See *City of St. Louis* v. *Praprotnik*, 485 U.S. 112, 127 (1988).

277. Acting as subordinate to the Department of Veterans Affairs, an Art. II executive branch agency under the U.S. Const., then Pursuant to *Monell* v. *Department of Social Services of New York*, 436 U.S. 658 (1978), the Defendants through its policymaker, the Department of Veterans Affairs, Defendants (and possibly other policymakers whose identities are not yet known) are liable for the harms and losses sustained by the Plaintiff because the Defendants violated his civil rights.

278. In the alternative, if the Defendants or Taylor lied about seeking counsel from the GPD Program Liaisons, and because Taylor stated verbally and in the discharge letters he also received legal counsel from "… U.S. VETs Attorney, Carla Ford,", then this court must hold

that Taylor was acting under the cover of the VA's authority, just the same as if the VA actually did approve the Plaintiff's discharge.

279. In the Second Circuit, those standards permit a supervisor to be held personally liable under Section 1983 or *Bivens* based not only on the supervisor's actual knowledge, but also on merely constructive knowledge, of a risk of wrongdoing by subordinate officials *e.g.*, *Poe v. Leonard*, 282 F.3d 123, 141-142 (2d Cir. 2002); *Black* v. *Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *Meriwether* v. *Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989); *McKinnon* v. *Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), cert. denied, 434 U.S. 1087 (1978).

**Damages**

280. Plaintiff was homeless for the first time in his life. This homelessness occurred because of surgical negligence on the part of the VA. The Plaintiff turned to a VA social worker that helps veterans at risk of becoming homeless. When the Plaintiff asserted his civil rights and lawfully requested a judicial remedy, the Defendants retaliated. The Plaintiff warned the Defendants not to retaliate and was told the decision to discharge the Plaintiff was approved by Defendant's legal counsel. The Defendants also made false statements of fact to the effect that the Veterans Administration approved the Plaintiff's discharge. Additionally, when Plaintiff asked Defendant's corporate counsel to reconsider the facts she declined. Plaintiff, already suffering from Leg Paralysis, major depression disorder, and extreme financial hardship, suffered further when the Defendants discharged him in retaliation for the protected activity of seeking a judicial remedy to correct the Defendant's refusal and/or failure to act upon his and the VA's GPD Program Liaison request for a reasonable accommodation. Due to the disregard for the Plaintiff's civil rights, the Plaintiff is seeking:

   a. <u>Pecuniary Damages in the Amount of $500,000.</u> The Defendants, charged with helping homeless veterans, violated the Plaintiff's civil rights causing him damages in the form of malnutrition and significant emotional distress at a time when he was suffering from Leg Paralysis, Major Depression Disorder, and extreme financial hardship.

b. <u>Exemplary Damages</u>. Where applicable, Plaintiff seeks economic and noneconomic damages pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code. The Defendants are an organization that receives federal funding from the VA to serve both able-bodied and disabled veterans and the Plaintiff is a disabled veteran. The conduct on the part of the Defendants is particularly egregious and petty; therefore, Plaintiff will seek and deserves an award for exemplary damages.

c. <u>Injunctive Relief.</u> Plaintiff asks for this court to 1. Refer this matter to the United States Attorney General, civil rights division, for ongoing oversight to prevent or deter Defendants from violating the civil rights of other veterans; 2. Refer this matter to the VA's Office of Inspector General for violation of 38 C.F.R. Part 18 *et seq.* for consideration for remedial action or possibly debarment.

**Damages Split**

281. The Plaintiff Recognizes the financial award may harm the veterans the program is designed to help. In an effort to offset the burden, the Plaintiff will split any damages awarded in this cause of action in the following manner: 50% to the Plaintiff, 25% with The Warrior's Refuge (Another GPD Program provider), and 25% to the Lone Survivor Foundation, now known as Team Never Quit in the Plaintiff's name.

## <u>PLAINTIFF'S APPLICATION FOR COURT-APPOINTED COUNSEL</u>

282. Whereas I, the Plaintiff herein, believe with a high degree of certainty that I will survive and prevail at trial *pro se*, believe this court may strictly hold me to the Fed. R. Civ. P., based on the thoroughness of my pleadings; and.

283. Whereas I am technically homeless, living in "*flux*" in a homeless shelter, without permanent residence; and.

284. Because this is a very real and ripe controversy, involving a claim to preserve my and others' similarly situated, human and civil rights under the ADA, I, and others, would be best served

with the assistance of counsel in this Civil Rights case. The appointment of counsel is proper and warmly welcomed, pursuant to 28 C.F.R. § 36.501, (Private suits)[21].

285. Also, as the Plaintiff, I welcome any other protections this court may offer *sua sponte*.

## CERTIFICATIONS & CONDITIONS PRECEDENT
## *IQBAL & TWOMBLY*

286. Plaintiff is a *pro se* litigant and declares that all facts stated herein, and exhibits attached are "factual content" and meets the "plausibility" standard in *Iqbal* and *Twombly*. A decision in the Second Circuit held that "[e]ven after *Twombly*,...we remain obligated to construe a *pro se* complaint liberally." *Harris* v. *Mills*, 572 E3d 66, 72 (2d Cir. 2009). The Plaintiff herein has pleaded "more than the mere possibility of misconduct" of special matters to survive a motion to dismiss. *See*, e.g., *Atherton* v. *District of Columbia Office of Mayor*, 567 E3d 672, 681-82 (D.C. Cir. 2009).

## CERTIFICATION

287. Under Fed. R. Civ. P. 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint:

 a. Is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
 b. Is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law;
 c. The factual contentions have evidentiary support or, if specifically, so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
 d. The complaint otherwise complies with the requirements of Rule 11.

---

[21] 28 CFR § 36.501, Private suits, (a) General ..."*Upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the civil action without the payment of fees, costs, or security.*"

## **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Thomas Edwin Olson, respectfully prays this court take the following actions:

a.  Order the Defendants to appear and answer before the court in a trial by jury;

b.  Make referrals to the Civil Rights Division of the United States Attorney's Office and the Office of Inspector General of the Department of Veterans Affairs;

c.  Upon trial, find that the Defendants have violated the laws of the State of Texas and the United States, the Code of Federal Regulations, and enter a Judgment of the court's findings;

d.  Grant to the Plaintiff, where allowed, economic, noneconomic, and exemplary damages to be paid by the Defendants in the amount of $3,000,000 across the six causes of action herein;

e.  Order Defendants to pay Plaintiff's costs and expenses incurred in this action;

f.  Order Defendants to pay Plaintiff's legal counsel's fees incurred in this action; and

g.  Grant to the Plaintiff any such other and further relief as the Court deems just and proper.

Respectfully submitted,

Plaintiff, *pro se*

Thomas Edwin Olson
7342 Grandview Meadow Drive
Magnolia, Texas 77354

281-236-2506
olson@webtoaster.com

Pacer Account No. 6374371,
Pacer Username: Webtoaster,
Upgraded Pacer User

## CERTIFICATE OF SERVICE

I certify that on May 23, 2024, I filed the foregoing document(s) with the clerk of the court and would be available for viewing and downloading from the Court's Pacer/CM/ECF system, and that the participants in the case may or may not be registered CM/ECF users.

I further certify that a copy of the foregoing document(s) where sent to the following persons:

Carla Ford
General Counsel
U.S. Vets
800 W 6th Street
Suite 1505
Los Angelas, California 90017-2743
Email: CFord@usvets.org

Respectfully submitted,

Plaintiff, *pro se*

Thomas Edwin Olson
7342 Grandview Meadow Drive
Magnolia, Texas 77354

281-236-2506
olson@webtoaster.com